**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

**DERRICK A. MILBOURNE,  et al.**

**Plaintiffs,**

**v.**                                                              **3:12CV861-REP**

**JRK RESIDENTIAL AMERICA, LLC.,**

**Defendant.**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF HIS
MOTION TO STRIKE THE DECLARATIONS
OF MIKE MOERSCHBACHER**

Plaintiffs, Derrick A. Milbourne, et al., have moved to strike the Declarations of

Mike Moerschbacher because they are not based on personal knowledge and are contrary

to the testimony he supplied as the Defendant's rule 30(b)(6) deponent on behalf of the

corporation as well as testimony he provided as a fact witness. Based on Fed. R. Civ. P.

56, Rule 37(c)(1), and Fed. R. Evid. 401, 602, 802, & 1101, Plaintiffs supply this

memorandum of law in support of their motion to strike.

**OVERVIEW**

Personal knowledge of facts about which a witness testifies is essential in

deciding a motion for summary judgment, whether such testimony is ore tenus, by

affidavit or declaration. On November 10, 2015, Defendant JRK Residential America,

LLC ("JRK") filed its second Motion for Summary Judgment and a Motion to Compel

Arbitration, which are supported by declarations from its employee fact witness and

corporate designee, Mike Moerschbacher ("Mr. Moerschbacher")(Docs. 150, 155.)  With

respect to the Second Motion for Summary Judgment, the Moerschbacher Declaration is

being used in an attempt to establish that 650 class members signed a form that JRK argues satisfies the requirements of 15 U.S.C. § 1681b(b)(2).  (Doc. 150.) In regard to the Motion to Compel Arbitration, the Moerschbacher Declaration is being offered in an attempt to establish that 513 class members sign arbitration agreements. (Doc. 155.)

Mr. Moerschbacher has provided testimony in a recent deposition where he was examined on whether he has personal knowledge of the matters about which he testified. (Moerschbacher Dep.)(Doc. 165-1).  He does not have personal knowledge either about the matters in either of his Declarations, therefore his Declarations and all related information must be stricken.

On May 2, 2014, JRK belatedly made its mandatory disclosures under Fed. R. Civ. P. 26(a)(1).[1] (Ex. 1). The first discovery cut-off was July 1, 2014, pursuant to the Court's Scheduling Order. (Doc. 26).   Mr. Moerschbacher as "SVP, Human Resources" was disclosed because he was expected to be familiar with (1) Defendant's policies procedures and practices relating to conducting background checks of applicants, (2) the disclosures and notices provided to applicants regarding background check requests and related adverse actions, (3) the relationship between Defendant JRK and third party service provider U.S. Background Services, Inc., and (4) the facts relevant to the causes of action in this case." The parties have engaged in three rounds of discovery.  Most recently, the parties engaged in a round of re-opened discovery in order to allow the Class to learn about what has become known in this litigation as the "disputed standalone form," but which JRK has always referred to as the "contingency form." (Moerschbacher Dep. Tr. 90).   Neither the disputed standalone form nor the purported arbitration

---

[1] Beginning in October of 2013, Plaintiff's counsel attempted to schedule a conference pursuant to Fed. R. Civ. P. 26(f). The history of round one of discovery is related in Plaintiff's Memorandum in Support of Motion to Strike Declaration of Mike Moerschbacher and Shon Morgan previously filed in this case.  (Doc. 52.)

agreement have ever been disclosed pursuant to Fed. R. Civ. P. 26(a)(1) or (e).  Despite requests for production directly bearing on both the disputed standalone form and the purported arbitration agreements, JRK did not produce them.[2]

The lack of discovery responses is only important because Defendant represented it had fully and completely answered Plaintiff's discovery or was gathering responsive information that would have disclosed all the documents very early in the case.  (Doc. 52-2, 52-6.)   In the third round of discovery, which was the re-opened discovery, Mr. Moerschbacher verified JRK's answers to the interrogatories. (Moerschbacher Dep. Tr. 81:10-83:14.)  Mr. Moerschbacher then provided deposition testimony on November 13, 2015, wherein he testified that he did not, in fact, provide the answers, but he merely reviewed and edited them. (Docs. 150, 155)(Moerschbacher Dep. Tr. 98:9-100:24; 102:1-106:22; 108:5-111:9; 117:5-122:13; 102:12-112:25.)

Then, Moerschbacher admitted in his deposition that he does not have the personal knowledge about the facts to which he testified in the Declaration attached to the motion.[3]  (Doc. 155)(Moerschbacher Dep. Tr.117:5-122:13; 102:12-112:25.)   In fact, he has absolutely no personal knowledge of any of the documents attached to his Declaration.  (Moerschbacher Dep. Tr. 111:25-121:25.)  He reviewed a single portable document file (.pdf) that was sent to him electronically by JRK's lawyers. He flipped through the electronic file on his computer screen to see if there was a signature on the forms that were contained in the file.  (Moerschbacher Dep. Tr. 109:8-110:22.)  He assumed, but did not know, that the documents containing the purported disputed

---

[2] See Defendant's Supplemental Responses and Objections to Plaintiff's Requests for Production of Documents nos. 3, 17, 18, 28, 29, and 32.  (Docs. 52-2, 52-6.)

[3] Plaintiff is moving separately for an Order striking the Declaration of Mike Moerschbacher because he admitted that it is not based on personal knowledge.

disclosures and arbitration agreements were authentic electronic copies, although he did not know how or who compiled them.  (Moerschbacher Dep. Tr. 110:10-111:25.)

Not only is the Declaration outside of Mr. Moerschbacher's personal knowledge, but it is also contrary and inconsistent with Defendant's discovery responses, production and testimony in this case. Just like the declarant in *Soutter v. Equifax*, Moerschbacher merely signed a declaration prepared by JRK lawyers, he did not read the documents attached to the exhibit, and he did not have personal knowledge of the matters asserted in the documents themselves, and was not present for any aspect of the execution of any document. In *Soutter*, this court found:

> Johnson's affidavit recites that its predicate is his personal knowledge. Pl.'s Br. Supp. (Docket No. 157), Ex. B ("I have personal knowledge of the matters discussed below."). To the contrary, in his deposition Johnson admitted that he did not have personal knowledge of the matters recited in the affidavit. In fact, he merely signed a document that an unknown lawyer for LexisNexis prepared and delivered to him for signature. *See* 2013 Deposition (Docket No. 157–3), at 22–24 (Dep. pp. 52–54). Nor did Johnson read the documents attached to the affidavit *129 as exhibits, documents about which he made sworn substantive averments in the text of the affidavit.[5] Equifax does not contend that Johnson's affidavit is based on personal knowledge.

*Soutter v. Equifax Info. Servs. LLC*, 299 F.R.D. 126, 128-29 (E.D. Va. 2014).

## STANDARD OF LAW

Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Similarly, Federal Rule of Evidence 602 further requires that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge in the matter." Federal Rule of Evidence 1101 provides that the Federal Rules of Evidence apply to all

proceedings before the United States district courts, which would include a motion to compel arbitration. *See Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 544 (D. Idaho 2010). Evidence should not be admitted if it is hearsay under Fed. R. Evid. 802 or if it is irrelevant under Fed. R. Evid. 401.

The Fourth Circuit has routinely held that affidavits that do not meet the requirements of Rule 56 may be disregarded by the trial court and even stricken. *See, e.g.*, *Mascone v. Am. Physical Soc'y, Inc.*, 404 F. App'x 762, 765 (4th Cir. 2010); *Evans*, 80 F.3d at 962; *Cline v. Harmon*, 2012 WL 3822189, at *2 (S.D.W. Va. Sept. 4, 2012). The spirit of the Federal Rules of Civil Procedure, the Federal Rules of Evidence, as well as case law relating to this issue, demand that affidavits and declarations be made on personal knowledge regardless of the stage of litigation in which they are presented and evaluated. Those that are not based upon personal knowledge, are not admissible. *Soutter v. Equifax Info. Servs.*, 299 F.R.D. 126 (E.D.Va. April 8, 2014). This court has held that a declaration is to be analyzed the same as an affidavit for this purpose. *Id.* Therefore, for the reasons discussed below, the Court should strike the declarations of Mr. Moerschbacher, whose testimony and evidence are unreliable. JRK knows that its lawyers created the declaration and all the exhibits, that the declarant did not supply the information or have personal knowledge of the truth and accuracy of the documents attached to the Declaration. In its exhaustive analysis of the standard to be applied to such a declaration, this court has previously found it appropriate to strike such a declaration because it is unreliable. *Id.* at 19.

## FACTS

Mr. Moerschbacher's deposition testimony clearly demonstrates he does not have personal knowledge of the facts in his Declaration, most importantly that any of the attached exhibits are true and correct copies of any of the class member's agreements signed and dated by the class member.   All of Mr. Moerschbacher's testimony with respect to the documents attached to his Declarations indicate it is nothing more than "'hearsay and secondhand information.'"  *Soutter*, 299 F.R.D. at 130 (citations omitted). With respect to the arbitration agreements, Moerschbacher testified:

> Q: Now, this declaration has 510 identified individuals or references 510 individual mediation and arbitration agreements with signatures and dates on them, right?
>
> A: Right.
>
> Q: Now, we just talked for 20 minutes about the previous declaration. Is there anything that was different in the way that you handled and eventually signed, read -- reviewed and signed, this arbitration declaration that was different than the disclosure declaration?
>
>  A: No.
>
> Q: So I don't have to repeat all that, right?
>
> A: I would appreciate it if you didn't.
>
> Q: Okay, then I won't, but I want to make sure I hit some of the high points, nonetheless. This is the CliffsNotes version. This declaration, again, would have been given to you by one of the Baumann brothers for your review, right?
>
> A: Yes.
>
> Q: And it would have been one pdf file with each of the purported mediation/arbitration agreements at the end or in the same file -- in the same pdf, sorry, pdf declaration, right?
>
> A: Correct.
>
> Q: Yes? All right. And it would have been true, like in the previous instance, you did not go through and compare, for example, paragraph 378 with the correspondingly cited Exhibit 375 of Leon Reed, right?
>
> A: Correct.

Q: You would have gone through and made sure they were signed, just like with the disclosures, right?

A: Correct.

Q: All right. Now, the one thing that would deviate from our previous exchange might be the sampling.  It's fair to say that the Motion to Compel arbitration  thing, you understand, is pretty new as a strategy, right?

A: Yes.

Q: Why didn't you pull out the mediation and arbitration agreements earlier in this case?

A: I wasn't asked to.

Q: But you've known about it the whole time, right, your company has?

A: Yes.

Q: These files, these documents, that you referenced in your declaration, you've had these in your company's possession since the moment this lawsuit was filed, right?

A: Yes.

Q: And you personally, as senior vice president, you know that your company has been trying to make employees sign mediation/arbitration agreements for several years, right?

A: Yes.

Q: Now, with respect to the 50 files that you sampled, when you pulled the files, the samples, you weren't looking for -- at that point you weren't looking for the mediation/arbitration agreements, right?

A: No.

Q: So, in truth, the only one who knows whether or not the arbitration and mediation agreements -- I mean, the only person whose eyes have actually confirmed that there is a mediation/arbitration agreement in the corresponding consumer personnel file is the person that put the original .pdf declaration together for you to sign, right?

MR. BAUMANN: Objection. Calls for speculation, assumes facts not in the record.

THE WITNESS: I am confident there is a mediation and arbitration agreement in every employee's file.

BY MR. BENNETT: Q: Okay. I understand that you have your policy and[...] this is our procedure, this is what we would have been done, there's a way to go that way, but I'm asking here about the personal knowledge path, like personal knowledge of the documents themselves. And so what my question was, at least in the disclosure form you had a 50 sample taken, right?

A: Yes.

Q: Yes? That's not true for the mediation and arbitration declaration, right?

A: Correct.

Q: And in the disclosure -- well, I could be wrong on both. In either of these declarations, the disclosure declaration and the arbitration declaration, did you instruct your HR assistants to go through and make a list of everybody, every personnel file, that had a disclosure form or that had an arbitration form?

MR. BAUMANN: Objection. Compound.

BY MR. BENNETT: Q: Your assistants.

A: Which form are you speaking of?

Q: Well, question one -- Counsel doesn't like when I knock two birds out with one stone. Question one, with respect to this disclosure form, did you instruct your HR assistants, the employees
for your company, to pull out or make a list of each of the personnel files with the consumers regarding a corresponding personnel file that contained a disclosure form -- the Contingency Form?

A: We have a list, yes.

Q: Did you get that list by having your actual JRK employees, not [Attorney] Mr. Baumann or anybody with Emanuel [Quinn], but your actual HR assistants or Ms. Keaton to actually pull those forms from the personnel files?

A: I don't recall.

Q: It could have been the law firm that did it, right?

A: It could have been.

Q: And then you said "we have a list." That list, it could have been prepared by the law firm, right?

A: It's possible.

Q: You don't have any knowledge, personal knowledge or otherwise -- you don't have any actual knowledge that such list was prepared by your assistants?

A: Correct.

Q: [...]With respect to the mediation and arbitration declaration, do you have any knowledge as to whether or not your HR assistants or Ms. Keaton actually pulled the mediation and arbitration agreements from individual personnel files?

A: No.

Q: Do you know who did that, who pulled the individual arbitration agreements from individual files?

A: I do not.

(Moerschbacher Dep. Tr. 117-122.) Moerschbacher testified regarding the disputed

disclosure form:

Q And then at the point when you were told the way, I'm trying to be careful because I don't want to
get into attorney-client communications, so I'm assuming generally that someone told you that we were going to come look at the documents. You then -- you knew that you or JRK had to gather the files into boxes, right?

A Yes.

Q All right. So take me from that point, the point when the lawyer, brothers Baumann or otherwise, come and tell you or email you or call you, whatever, that's the past, times zero. Moving forward is the point when you get off the phone or leave the office and you know now we've got to get these files. What do you do there? What's the next step, the first step?

A We, um, engaged an agency, temporary agency, for head counts to help us physically do the work, and the HR assistants were given -- we broke up the list alphabetically, and the HR assistants took the temporary folks and oversaw the process down in our third floor into the parking structure basement storeroom and we began pulling the files, stuffing them into banker's boxes.

Q Now, you say "we." How many boxes did you stuff, you personally?

A None.

(Moerschbacher Dep. Tr. 96).

    ***

Q But it's not a regular part of your, you know -- how about this, it's not a substantial part, let's start with that, of your job as senior vice president at JRK to be running access and looking through those files, right?

A Not a substantial part, correct.

Q And it's not -- you know, it has occurred here and there, but it's not a regular part of what you do as part of your job as senior vice president of HR?

A Well, I already stated that I'm in the file room quite frequently every week.

(Moerschbacher Dep. Tr. 98-99).

\*\*\*

Q Page 1, Exhibit 5, your declaration in support of the most recent Motion for Summary Judgment, first paragraph says, No. 1, "I am the head of human resources."

A Yes.

Q Are you with me?

A Yes.

Q Second sentence says "I make this declaration of personal firsthand knowledge." Do you see that?

A Yes.

Q Okay. Now, if you turn to the second page, and you list on paragraphs 4 through 653 individuals for whom you say attached as Exhibit 1 is a true and correct copy of 11:48:56

A Correct.

Q That person's disclosure, which you signed on February 18, 2001

A Right.

Q -- 2011. So let's start with something I think  has got to be obvious. You don't have any personal
knowledge that any of these people actually signed these documents on that date, right?

MR. BAUMANN: Objection. Vague as to "personal knowledge."

THE WITNESS: I look at the form, it's signed, dated on that date.

BY MR. BENNETT: Q That's all you're saying. You were not there watching them sign it, obviously, right?

A Correct.

Q This is just a screw-up because your lawyers overstated the phrase "personal knowledge."

MR. BAUMANN: Objection. Argumentative.

THE WITNESS: I think it's reasonable to assume I have personal knowledge since it's part of the process for contingent hires.

BY MR. BENNETT:

Q Well, you don't have personal knowledge that these people signed these documents. You have personal knowledge -- like let's go to 626, paragraph 626. "Attached as Exhibit 623 is a true and correct copy of Lefty Williams' disclosure form, which he signed on August 15, 2010." Do you see that

A Yes.

Q You do not have any personal knowledge that Lefty signed the document on August 15, 2010

MR. BAUMANN: Objection. Vague as to personal knowledge. 11:50:43

BY MR. BENNETT: Q – right

A I believe it's reasonable to say if I see a signed form and a signature and date, I believe it's
reasonable to say that I have knowledge. That's our process.

Q Do I have personal knowledge that you had breakfast today?

MR. BAUMANN: Objection. Calls for speculation.

THE WITNESS: You haven't asked me.

BY MR. BENNETT: Q Do I have personal knowledge? It's reasonable to assume you had breakfast, right?

A Yes.

Q Is that the same thing in your mind when you say "I have personal knowledge"? Would you think it thus comparable for me to say I have personal knowledge that

you had breakfast today, though I'm only making that statement because of a reasonable assumption?

MR. BAUMANN: Objection. Compound.

THE WITNESS: I don't think that's a reasonable assumption. You have no document in front of you with a signed date and a signature and a form which you're comfortable and knowledgeable about that states I had breakfast.

BY MR. BENNETT: Q Mitzi Keaton told me that you do not access files directly.

MR. BAUMANN: Objection. Misstates the record.

BY MR. BENNETT: Q Well, how about this, Mitzi Keaton testified to Mr. Baumann's ear to my questions that she does not have any specific recall that she is the one that drafted the Contingency Form. So do I have personal knowledge that she did not draft the Contingency Form?

MR. BAUMANN: Objection. Calls for speculation

BY MR. BENNETT: Q I mean, I don't, so there's nothing to speculate. I don't have personal knowledge of that, but I'm trying to understand you, what you think -- you know, the liberties you'd be willing to use with the phrase "personal knowledge." would suggest this to your counsel, our trial judge has examined this issue at great length in a Westlaw case you can look at titled Donna Soutter, S-o-u-t-t-e-r, versus Equifax and what personal knowledge actually is. But let me try it this way: You did not personally see Lefty Williams sign the disclosure form, right?

A Correct.

Q You did not personally see anybody put the on that disclosure form, right?

A Correct.

Q You did not personally verify that that form was signed on the date indicated with, in this instance August 2010. You did not personally verify that, right?

MR. BAUMANN: Objection. Vague as to "verify."

THE WITNESS: Correct.

BY MR. BENNETT:

Q Your basis for making these statements is you think that -- and by the way, there's some law that supports your thought on this -- but it is not based on personal knowledge; it is based on your belief that the signature and the date in these documents would be fairly

presumed to be true because they're there, right?

A Yes

Q Do you have paragraph 4? Or what page are you on, Mr. Moerschbacher? Are you still with Lefty Williams?

A I'm still on Lefty Williams. Lefty and I, you know, together now.

Q So is it true that what you are intending to communicate here with Lefty Williams in paragraph 626 is  that attached is Exhibit 623, which you believe is a true and correct copy of Lefty Williams' disclosure form, which you believe shows that he signed it on August 15, 2010?  Is that a fair characterization of what you were intending to say?

A Yes.

Q Now, these documents themselves, exhibits -- or attachments to this declaration, which I didn't reproduce, but Exhibits 1 through 650, who put them into a declaration in matching them up to a particular form?

A Our attorneys.

 Q So when you were given this by your attorneys, you were given this declaration by the lawyers, right, you didn't type it yourself?

A Correct.

Q And then you would look at paragraph 4, and you actually compare every paragraph in here to the
corresponding attachment?

A I reviewed the pdf, which contained all of these in one, and signed off on this.

Q Okay.

A Noted that the pdf had signatures on every single form.

Q But did you go through -- for example, when you were at paragraph 260, "Attached as Exhibit 257 is a true and correct copy of Robert Jaime's," J-a-i-m-e, apostroph apostrophe "s," "Robert Jaime's disclosure form, which he signed on July 8, 2013," did you go through and pull out in your pdf  Exhibit 257 and line it up and compare it to paragraph 260
in the declaration?

MR. BAUMANN: Objection as to "pull out and compare." What does that mean? It's a pdf with all the ones in it. I don't know what "pull out and compare" means.

BY MR. BENNETT

Q Do you have one computer screen on your desk or two?

A One

Q All right. So did you scroll down from page -- from the declaration until you got to Exhibit 257 in the pdf and compare it and then go back up and go, and go "check, that paragraph works"? 11:58:28

A No.

\*\*\*

MR. BENNETT: Okay.  Q So you open the pdf, and it has all of these attachments as part of the same document, right?

A Yes

Q So then you went down -- I'm sorry, you did not go paragraph by paragraph confirming the correctness of what the lawyers had sent you with the actual cited exhibit, right? 11:59:20

A Correct.

Q But then you mentioned earlier that you checked signatures. So what did you do? You went down to the end of the pdf and you went through all -- every page of
documents?

A I reviewed the pdf, which contained all of these documents, to ensure they were all signed, quickly, easy to flip pages.

Q Okay. Now, how long -- how much time did it take you personally to pull out from individual employee files the disclosure forms that were then made as part of this attachment?

 A I did not personally pull them out.

Q Well, who did?

A We had individuals helping us. The HR assistants did that.

Q Okay. So, then, how do you know that the documents that were at the end of this pdf, the attachments that were inside the pdf, how do you know that those are actually the documents that were in the actual personnel file, I mean, personally know that?

A It's logical to assume that they are.

Q Because you trust all the people that work for you, your employees, your lawyers, all of them, right?

A I do.

Q Right. And that's why it's logical, right

 A And, again, I have reviewed some in great detail.

Q Some individual files?

A Some of the actual documents themselves in detail.

Q All right. How many of them?

A A random amount. 50.

MR. BAUMANN: Vague as to what documents.  Mike, if you don't mind clarifying what documents.

BY MR. BENNETT: Q Sure. What documents?

A The actual files and to ensure that the background release was in the file and the Contingent Form
was in the file. I pulled files randomly myself to verify that.

Q And that -- all right. So the basis for your making this declaration -- and we'll talk a bit about the
next one too, the arbitration declaration -- the basis for you making this declaration is that you told your assistants, the employees, to pull certain documents out of personnel files, right?

A Correct.

(Moerschbacher Dep. Tr. 102-111.)

## ARGUMENT

**I.     There is no indicia that Mike Moerschbacher has personal knowledge regarding any of the documents attached to either of his Declarations.**

In support of its Second Motion for Summary Judgment, JRK uses Mr.

Moersbacher's declaration (Doc. 150) in an attempt to establish that JRK ensured its

FCRA compliance by (1) requiring some of its employees; (2) to sign and date a

"disclosure form"; (3) which a true an correct copy of each of the 650 "disclosure forms" was attached to his declaration; (4) that he had access to and reviewed JRK's business records and other documents; (5) that he has personal knowledge of the facts as part of his duties.

In support of its Motion to Compel Arbitration, JRK uses Mr. Moerschbacher's declaration (Doc. 155) in an attempt to establish that JRK is entitled to an order compelling arbitration because JRK required (1) some of its employees; (2) to sign and date a "mediation and arbitration agreement"' (3) which a true an correct copy of each of the 510 "mediation and arbitration agreements" was attached to his declaration; (4) that he had access to and reviewed JRK's business records and other documents; (5) that he has personal knowledge of the facts as part of his duties.

However, Mr. Moerschbacher did not have personal knowledge that any of the documents attached to his declaration were true and correct (Moerschbacher Dep. Tr. 109:14-116:14). In fact, Mr. Moerschbacher only reviewed 50 randomly selected files. (Moerschbacher Dep. Tr. 110:3-111:9). He had no knowledge that any documents were signed by the employees on the dates on the forms, but assumed or presumed they were. (Moerschbacher Dep. Tr. 103-105). JRK's lawyers provided the Declaration and all the attachments, Moershbacher merely flipped through the .pdf pages on his computer and signed. (Moerschbacher Dep. Tr. 108:5-111:9.)

Mr. Moerschbacher Declaration states he has personal knowledge of the facts. He claims to have reviewed company records. Out of the more than 1000 documents he has attached to his Declarations, Mr. Moerschbacher randomly reviewed only about 50. Mr. Moerschbacher's Declaration is conclusory, and it was only through examination under

oath that Plaintiffs learned that the Declaration represents only a rubber stamp of a document supplied to Moerschbacher by JRK's lawyers.

There is no reliability in these documents, which are being offered for the truth of the matter asserted. There is no evidence that Moerschbacher personally performed or supervised other tasks that form the basis of the so-called facts in his declaration, thus his statements lack the basic evidentiary requirement that a witness must have personal knowledge of the subject of his or her testimony. Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *see also Bond v. Story*, 2011 WL 5599390, at *2 (E.D. Va. 2011) (Lauck, J.) (prohibiting the use of affidavits on a summary judgment motion where the affidavits were not based on the declarant's personal knowledge.); *Soutter v. Equifax Info. Servs*., 299 F.R.D. 126 (E.D.Va. April 8, 2014)(striking the declaration of Equifax's witness on summary judgment because he did not have personal knowledge of the facts and the declaration was in conflict with his deposition testimony).

## II.     The Moerschbacher Declaration is Inadmissible Hearsay.

Not only are Moerschbacher's statements not based on his personal knowledge, but they are also inadmissible hearsay.  Whether, when, how and by whom the disputed disclosures were obtained and signed, especially as to the specific class members, are all out of court statements being offered for the truth of the matter asserted.  Whether, when, how and by whom the purported mediation and arbitration agreements were signed are also out of court statements being offered for the truth of the matter asserted.

Moerschbacher, as Senior Vice President of Human Resources, does not routinely manage the documents about which he purports to have knowledge.  He does personally, frequently obtain information from the files, but does not maintain them in the ordinary course of his duties.  He specifically testified that he did not review the records themselves, he was not there when the record was made, he does not know which employees were there or who made them, he did not compile the records but JRK's lawyers, his assistants and an outside temporary employment agency compiled the information.  Other than Mitzi Keaton, he could not name the assistants or temps who did the work.  He simply assumed that the documents that the lawyers gave him

Each of the factual representations made in Mr. Moerschbacher's Declaration constitutes inadmissible hearsay, and are insufficient as business records.  In fact, there is no information in the Declaration that would allow the court to conclude any of the representations of fact are based on business records – and the fact that the information flowed between JRK's lawyers and a temp agency hired by JRK may even make the source of the information an "outsider" since Moerschbacher did not obtain the information from JRK's files.  In fact, "[i]f the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have." *Rambus, Inc. v. Infineon Tech.'s AG*, 348 F. Supp. 2d 698, 707 (E.D. Va. 2004) (quoting *New York v. Microsoft Corp.*, No. CIV A. 98-1233(CKK), 2002 WL 650047, at *1 (D.D.C. 2002)).  Furthermore, "to satisfy Rule 803(6) [and Rule 902(11)], each participant in the chain which created the record—from the initial

18

observer—reporter to the final entrant—must generally be acting in the course of the regularly conduct business. If some participant is not so engaged, some other hearsay exception must apply to that link of the chain." *Rambus*, 348 F. Supp. 2d at 706 (citing 5 Weinstein's Federal Evidence, § 803.08[2] (2d ed. 2004)). In this case, outside participants not engaged in the regular course of business disrupts the business records exception here.

Moerschbacher clearly did not witness any employee or job applicant sign any of the documents. Moerschbacher clearly did not authorize, instruct, see or provide any of the disclosures or arbitration agreements to the applicants or employees. Since he did not have personal knowledge, his Declaration does not indicate what documents, if any, he relied on to support his statements regarding each of the documents, therefore the court cannot make the inferential leap that the information is based on anything that is categorized as "business records." Even if there were a statement in the Declaration that there were business records, which there isn't – it simply does not overcome hearsay presented by them.

Thus, in addition to the lack of personal knowledge, the Court should also strike the Declaration, which is comprised of inadmissible hearsay.

**III.    Rule 37(c)(1) requires the evidence of the arbitration and mediation agreements and the so-called disputed standalone disclosure forms be excluded.**

Rule 26(a)(1) and (e) require that any evidence to be used on a motion, hearing or at trial must be disclosed. Neither the arbitration agreement nor disputed standalone disclosure forms have never been disclosed by JRK. Fed. R. Civ. P. 37(c)(1) mandates that undisclosed evidence be excluded. JRK has had three years and three rounds of

discovery to disclose these important and, according to JRK, dispositive documents. Clearly, JRK has always known about them. (Moerschbacher Dep. Tr. 90:1-91:3; 118:13-119:11.) There is simply no excuse for failing to disclose them pursuant to Fed. R. Civ. P. 26 so that the opposing party can narrow discovery and understand the claims and defenses in the case. The sanction of exclusion is automatic

Some evidence must be introduced that supports a finding that the witness, in this case JRK's corporate designee, has personal knowledge of the matter. *Soutter*, 299 F.R.D. at 131. Here, there is no evidence whatsoever of Mr. Moerschbacher's actual knowledge of the authenticity of any of the documents. He only reviewed .pdf given to him by the lawyers. To the extent that JRK seeks to assert that such documents are lawful or reliable indicators of having enforceable arbitration agreements or standalone disclosure and authorization forms, they are simply not at all reliable for the truth of the matters asserted and are clearly inadmissible hearsay.

The Defendant is subject to Rule 37(c)(1) and cannot be permitted to use documents and evidence that it has refused to disclose and provide pursuant to Rule 26(a)(1) and Rule 26(e).[4] Unlike conventional discovery, a party's disclosure obligations are "self-executing." If a party does not properly and timely comply with Rule 26(e), it may not use the evidence it failed to disclose or supplement in a timely fashion. Fed. R. Civ. P. 37(c). *Barksdale v. E & M Transp., Inc.*, 3:10CV140, 2010 WL 4534954 (E.D. Va. Oct. 27, 2010)(finding that the court "must impose sanctions" for under Rule 37(c)(1) where there was no harmless error or substantial justification). Exclusion of evidence is

---

[4] JRK supplied all the personnel files to Class Counsel pursuant to a court order, which files Class Counsel then reviewed for the presence of the disputed disclosure form. However, because the complete personnel files contained many documents, Class Counsel cannot be expected to guess which ones satisfied JRK's obligation to disclose. The mandatory disclosures avoid surprise by requiring parties to lay their cards on the table.

the only appropriate remedy for a party's complete failure to disclose it, "[Rule] 37(c)(1) 'provides that a party who fails to [provide information or] identify a witness as required by Rule 26(a) or (e) is not allowed to use that [information or] witness to supply evidence on a motion.'" *Bland v. Fairfax County, Va.*, 1:10CV1030 JCC/JFA, 2011 WL 1660630 (E.D. Va. May 3, 2011)(quoting *Hoyle v. Freightliner, LLC,* 650 F.3d 321 (4th Cir. 2011).

The only exceptions in Rule 37(c) are for circumstances in which the failure to disclose was with "substantial justification" or in which the failure to disclose was "harmless." *Barksdale v. E & M Transp., Inc.*, 3:10CV140, 2010 WL 4534954, at *3. Neither of these limited exceptions applies in this case.  Experienced counsel has no safe harbor, where even "counsel's lack of familiarity with the Federal Rules is not an excuse sufficient to stave off the harsh sanction of Rule 37." *Campbell v. United States*, 3:10-CV-363, 2011 WL 588344 (E.D. Va. Feb. 8, 2011); *see e.g. Scott v. GMAC Mortgage, LLC***,** Civ. No. 10CV24-NKM (W.D.Va. April 14, 2011)(the court found GMAC's conduct to be egregious and accordingly ordered sanctions for failure to timely comply with discovery, including the sanction of entry of default and award of attorney fees.) They include instances in which the omission was limited, for a witness otherwise known to both parties, or when the negligent party was a *pro se* litigant.  *Id.; accord Barksdale v. E & M Transp., Inc.*, 3:10CV140, 2010 WL 4534954, at *3-4.

The Court's detailed analysis of the appropriate standard and remedy under Rule 37(c), the Court considered the severity of the exclusion remedy and determined the standard by which the remedy should be enforced.  The Court applied the *Burlington Insurance* test to consider the following five factors: (1) the surprise to the party against

whom the witness was to have testified; (2) the ability of the party to cure the surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony. *Rambus, Inc. v. Infineon Tech. AG,* 145 F. Supp.2d 721, 727-734 (E.D. Va. 2001). Importantly, there is no "bad faith" element, and even an innocent omission cannot constitute "substantial justification." *Southern States Rack & Fixture v. Sherwin-Williams Co.*, 318 F.3d at 596; *Scott v. GMAC*, 3:10CV24-NKM, at 11-12. As the Court explained in *Rambus*,

> [T]he plain language of the rule contains no requirement for bad faith or callous disregard of the discovery rules. In fact, the rule is rather harsh in that it automatically imposes the preclusion sanction unless the non-complying party can show that there is substantial justification for the failure to make the disclosure, and that the failure was harmless.

145 F. Supp.2d at 727.

First, even thought the Plaintiffs clearly knew about Mike Moerschbacher as the corporate designee, they were nonetheless surprised that his Declaration was being offered for two reasons: first, because he was not disclosed as a witness for this purpose and, second, because his Declaration testimony was so obviously contradicted by his deposition testimony. After receiving the answers to interrogatories, Plaintiff explored the information supplied in the interrogatories and learned that Moerschbacher really had very little personal knowledge of the information in the answers to Plaintiffs' written discovery, but that he had signed on behalf of the company. Furthermore, he testified that he really just signed off on a Declaration and documents prepared by JRK's lawyers. Other than randomly sampling and reviewing about 50 files and instructing the IT

department to conduct document searches, he could not competently testify to the authenticity of any documents.

Second, the ability to cure is non-existent but for the exclusion remedy. The answers to interrogatories, the deposition testimony and the Declaration are all contradictory, discovery has closed and a second round of summary judgment and class certification and decertification briefing is underway. Therefore, the unreliable testimony of Mike Moerschbacher is unsalvageable for use on summary judgment. The exclusion remedy is appropriate.

Third, there can be no excuse for failure to disclose the documents that Moerschbacher is attempting to introduce as facts. JRK has known about all the documents since the inception of the case according to Moerschbacher's deposition testimony. JRK has known that it may use such documents on a motion or at trial, yet specifically did not supplement its mandatory disclosures.

Finally, the testimony is important for two reasons, it purports to establish that JRK has numerous arbitration agreements with class members, upon which it claims it is entitled to compel arbitration and remove those class member claims from the class action altogether. Second, Moerschbacher's testimony purports to demonstrate that JRK's disputed standalone form meets the strictures of the authorization and disclosure provisions of the FCRA, which if it can be established that JRK provided FCRA-compliant disclsoures, then it had a permissible purpose to obtain the 650 class member consumer reports and there no liability under the FCRA for violation of § 1681b(b)(2).

There can be no doubt that the Plaintiff has been prejudiced by the Defendant's failure to comply with its disclosure obligations. *Scott v. GMAC*, 3:10CV24-NKM, at

11-12. Without substantial justification for the failure to disclose information required under Rule 26(a), a party is automatically excluded from using that information at trial. *Rambus, Inc. v. Infineon Techs. AG*, 145 F. Supp. 2d at 724.

The Defendant can't demonstrate substantial justification for failure to disclose documents it has known about since it was served with the Complaint nearly three years ago. Despite Plaintiff's good faith efforts in many efforts to meet and confer, the Defendant has not changed its position. *Scott v. GMAC*, 3:10CV24-NKM, at 11-12.

## CONCLUSION

For all these reasons, the Plaintiff respectfully requests the Court enter an Order striking the Moerschbacher Declarations as unreliable at a minimum because they do not bear the hallmark of reliability:   personal knowledge.   They statements and documents are otherwise inadmissible hearsay, lack relevance, are unfairly prejudicial and have not been disclosed pursuant to Fed. R. Civ. P. 26(a)(1) & (e).

Respectfully Submitted,

**Derrick A. Milbourne, on behalf of himself and others similarly situated,**

By:_____/s/_____
Leonard A. Bennett, VSB # 37523
Susan Rotkis, Esq., VSB #40693
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Blvd. 1A
Newport News, Virginia 23601
Telephone:  (757) 930-3660
Facsimile:  (757) 930-3662
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com

Casey Shannon Nash
Consumer Litigation Associates PC (Alex)
1800 Diagonal Rd

Suite 600
Alexandria, VA 22314
703-273-7770
Fax: 1-888-892-3512
Email: casey@clalegal.com

Matthew James Erausquin
Consumer Litigation Associates PC (Alex)
1800 Diagonal Rd
Suite 600
Alexandria, VA 22314
703-273-6080
Fax: 888-892-3512
Email: matt@clalegal.com

Thomas Ray Breeden
Thomas R. Breeden PC
10326 Lomond Drive
Manassas, VA 20109
703-361-9277
Fax: 703-257-2259
Email: trb@tbreedenlaw.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 25th day of November, 2015, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the following:

George Peter Sibley , III
Hunton & Williams LLP
951 E Byrd St
Riverfront Plaza
Richmond, VA 23219
(804) 788-8200
Email: gsibley@hunton.com

Shon Morgan
Quinn Emanuel Urquhart & Sullivan LLP
865 S Figueroa Street
10th Floor
Los Angeles, CA 90017
(213) 443-3252
Fax: (213) 443-3100
Email: shonmorgan@quinnemanuel.com

Thomas Richard Waskom
Hunton & Williams LLP (Richmond)
951 E Byrd St
Riverfront Plaza - East Tower
Richmond, VA 23219
(804) 788- 8403
Fax: (804) 788-8218
Email: twaskom@hunton.com

_____/s/_____
Susan Rotkis, Esq., VSB #40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd. 1A
Newport News, Virginia 23601
Telephone:  (757) 930-3660
Facsimile:  (757) 930-3662
Email: srotkis@clalegal.com