IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DERRICK A. MILBOURNE,
On his own behalf and on
Behalf of those similarly
Situated,

     Plaintiff,

v.                      Civil Action No. 3:12cv861

JRK RESIDENTIAL AMERICA, LLC,

     Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on the parties' joint oral motion, made at the Final Pretrial Conference, to have the Court decide, as a matter of law, whether defendant JRK Residential America, LLC's ("JRK") violation of 15 U.S.C. § 1681b(b)(2) of the Fair Credit Reporting Act ("FCRA") was "objectively reasonable," as that concept was defined by the Supreme Court of the United States in Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47 (2007). For the reasons set forth below, the Court finds that: (1) the "objective reasonableness" analysis set forth in Safeco does not apply because JRK did not adopt or act on an interpretation of the statute at the time that the violation occurred; and (2) assuming that JRK's conduct sufficiently

evinces an "interpretation" of the statute (as JRK contends to be the case), that interpretation is not objectively reasonable.

## BACKGROUND

### A.   Class Claims

On October 26, 2015, Plaintiffs Derrick A. Milbourne ("Milbourne") and Samantha Churcher ("Churcher") (collectively, "Plaintiffs") filed a First Amended Complaint ("FAC", ECF No. 147) on behalf of themselves and all others similarly situated, alleging that JRK violated two sections of the FCRA.   In Count One, Plaintiffs alleged that JRK took adverse action against potential employees without complying with 15 U.S.C. § 1681b(b)(3)(A), which requires that:

> In using a consumer report[1] for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates: (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter, as presented by the Bureau under Section 1681g(c)(3) of this title.

Count One is sometimes referred to as "the § 1681b(b)(3) claim."

---

[1] The FCRA defines a "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used in whole or in part for the purposes of serving as a factor in establishing the consumer's eligibility for:...employment purposes[.]"   15 U.S.C. § 1681a(d).

In Count Two, Plaintiffs alleged that the disclosure form that JRK provided to all potential employees ("the Standard Disclosure Form") violated 15 U.S.C. § 1681b(b)(2)(A), which provides that:

> A person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless: (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person.

Count Two is sometimes referred to as "the § 1681b(b)(2) claim." Plaintiffs alleged that the violations alleged in Counts One and Two were committed "willfully," and sought statutory and punitive damages.

Count Three, filed on behalf of a putative subclass of the class represented in Count Two, alleged that a second disclosure form that JRK provided to some potential employees ("the Standalone Disclosure Form" or "the contingency form") also violated § 1681b(b)(2)(A).

3

## FACTUAL BACKGROUND

In November 2010, Milbourne applied for, and conditionally received, a job with JRK pending satisfactory completion of a background check.  (FAC ¶¶ 7-9).  Before JRK obtained a consumer report on Milbourne, he signed two disclosure forms.  Id. at ¶¶ 15-18.  The first form, the "Standard Disclosure Form," provides in pertinent part:

> I certify that the information contained herein is true and understand that any falsification will result in the rejection of my application or termination of my employment.  I also understand that the requested information is for the sole purpose of conducting a background investigation which may include a check of my identity, work and credit history, driving records, and any criminal history which may be in the files of any state or local criminal agency...
>
> I hereby authorize this company, its corporate affiliates, its employees, its authorized agents, and representatives...to verify all information contained in this form or in my application and to inquire into any character, general reputation, personal characteristics, and mode of living...I hereby release this company, its corporate affiliates, its employees, its authorized agents and representatives and all others involved in this background investigation from any liability in connection with any information they give or gather and any decisions made concerning my employment based on such information.  I understand that any offer of employment I may receive is contingent upon the successful completion of the background investigation.  I further understand that I have a right, under Section 606(B) of the

4

> Fair Credit Reporting Act, to make a written
> request to this company within a reasonable
> period of time for a complete and accurate
> disclosure of the nature and scope of the
> investigation requested.

(ECF No. 49-2 at 2) (emphasis added).  Churcher also signed the
Standard Disclosure Form when she applied for employment with
JRK in September 2013.  (FAC ¶¶ 27-31).

After extensive discovery, it became apparent that
Milbourne, along with 558 other class members (not including
Churcher), had also signed a second disclosure form before JRK
obtained their background checks ("the Standalone Disclosure
form").  That form provides:

> I understand that my employment with JRK is
> subject to the successful clearance of my
> background report to acceptable company
> standards.  The results of my background
> report will be reviewed and evaluated by JRK
> and JRK, in its sole discretion, will
> determine whether it is approved.

(ECF No. 150, Exs. 1-650).

Milbourne was conditionally hired by JRK, contingent upon
the successful clearance of his background check.  After
receiving Milbourne's consumer report, which contained two
felony arrest records, JRK terminated Milbourne's employment.
(ECF No. 76-8 ¶¶ 2-3).  Milbourne did not receive a copy of his
consumer report or a summary of rights under the FCRA before JRK
informed him of its decision to terminate his employment.
However, Milbourne later received a "Notice of Adverse Action"

5

accompanied by those materials from United States Background Screening ("USBS"), the consumer reporting agency from which JRK purchased employment-purposed background checks. (ECF No. 76-5).

## PROCEDURAL HISTORY

On October 31, 2014, the Court certified two classes based on the alleged deficiencies of the Standard Disclosure form. First, the Court certified an "Impermissible Use Class," defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), (a) who applied for an employment position with Defendant or any of its subsidiaries, (b) as part of this application process were the subject of a consumer report obtained by Defendant during the two years proceeding [sic] the filing of the Complaint, (c) where Defendant used a form to make its disclosures pursuant to 15 U.S.C. § 1681b(b)(2) that contained a release and/or waiver of the signing consumer's claims and/or rights.

(ECF No. 56). The Court also certified an "Adverse Action" subclass, defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), (a) who applied for an employment position with Defendant or any of its subsidiaries, (b) as part of this application process were the subject of a consumer report background check obtained by Defendant on or after the date two years proceeding [sic] the filing of the

6

> Complaint, (c) where Defendant's records
> show that the applicant was denied
> employment because of the background check,
> (d) and to whom Defendant did not provide a
> copy of the consumer report and other
> disclosures stated at 15 U.S.C. §
> 1681b(b)(3)(A)(ii) at least five business
> days before the date the employment decision
> is first noted in Defendant's records.

Id.

On March 15, 2016, the Court granted Plaintiffs' motion for summary judgment on the issue of whether JRK violated the FCRA as to Count One (the § 1681b(b)(3) claim). (ECF No. 199). The Court also granted summary judgment for Plaintiffs on Count Two, finding that JRK had violated the FCRA as to those class members who signed the Standard Disclosure Form and did not sign the Standalone Disclosure Form or who signed the Standalone Disclosure Form only after JRK had procured their background report. Id. The Court granted summary judgment in JRK's favor on Count Three except as to 91 class members whose background reports JRK had already procured before they signed the Standalone Disclosure Form form. JRK conceded that it was not entitled to summary judgment as to those 91 class members, who remain part of the Impermissible Use Class. Id. The Court reserved for trial the issue of whether either of JRK's violations in Counts One and Two was "willful."

7

In accordance with those decisions, the Court amended the definition of the Impermissible Use Class, which now includes the following consumers:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), (a) who applied for an employment position with Defendant or any of its subsidiaries, (b) as part of this application process were the subject of a consumer report obtained by Defendant (c) on or after November 30, 2010 (two years preceding the filing of the Complaint) and before March 15, 2016 (the date of the Court's Order amending this definition) (d) where Defendant used a form to make its disclosures pursuant to 15 U.S.C. § 1681b(b)(2) that contained a release and/or waiver of the signing consumer's claims and/or rights, and (e) Defendant did not provide the applicant with any other disclosure form prior to obtaining the applicant's consumer report.

(ECF No. 203). Because Milbourne had signed the Standalone Disclosure Form, he could no longer prosecute a claim on behalf of the Impermissible Use Class; and, therefore, Churcher was appointed to serve as the Impermissible Use Class representative. Id. Milbourne remains the class representative of the Adverse Action Sub-Class. Id.

In addressing the admissibility of exhibits and the substance of instructions on the topic of willfulness, JRK argued that, under Safeco, it was entitled to judgment as a matter of law on Count Two, the § 1681b(b)(2) claim. That was

so, said JRK, because its use of the Standard Disclosure Form was objectively reasonable. Therefore, according to JRK, it could not be held accountable for a willful violation under Count Two.[2] Plaintiffs argued that Safeco was inapplicable because JRK had never adopted or acted on an interpretation of § 1681b(b)(2); and that, as a matter of law, JRK was objectively unreasonable in acting as it did even if JRK could be considered to have acted pursuant to some interpretation of § 1681b(b)(2).

The factual record respecting this issue is fairly sparse. The entirety of JRK's evidence on this point amounts to one e-mail from Melody Salazar ("Salazar"), an administrative assistant at JRK, to Andrew Klein ("Klein"), head of USBS. (ECF No. 49-1). In that e-mail, Salazar requests that USBS' "compliance/legal" team examine the Standard Disclosure Form before JRK begins using it. Id. JRK points to that e-mail as evidence that it engaged USBS, which holds itself out as comprised of "professionals who have devoted their entire careers to Pre-Employment Screening...and Employment Law" to interpret the FCRA on JRK's behalf and ensure JRK's compliance with the statute. (ECF No. 49 ¶ 3).

---

[2] JRK does not contend that it adopted an objectively reasonable interpretation of 15 U.S.C. § 1681b(b)(3). The only remaining question to be decided as to Count One, therefore, is whether JRK's violation was knowing or reckless or whether it was merely negligent. The parties agree that that issue should be decided by the jury. Accordingly, only the reasonableness of JRK's interpretation of § 1681b(b)(2) is addressed herein.

However, when deposed, Salazar testified that the purpose of that e-mail was merely to confirm the compliance of a particular box that she had added to the form "for accounting purposes only." (ECF No. 262-4, Deposition of Melody Salazar, at 63:15-24). Moreover, the record clearly shows that JRK did not retain USBS for legal or compliance purposes. Instead, the record proves that JRK merely paid USBS to provide background reports, a service for which USBS was paid on a report-by-report basis. (ECF No. 270-1, Deposition of Michael Moerschbacher, at 35:1-17). JRK's contract with USBS contains no mention of compliance services. Id. at 35:12-36:8. Furthermore, according to JRK's head of Human Resources and corporate designee pursuant to Fed. R. Civ. P. 30(b)(6), neither he nor anyone else at JRK communicated with USBS concerning JRK's compliance with § 1681b(b)(2) during the class period. Id. at 36:14-23. There is no evidence about when or why the release language was included in the Standard Disclosure Form or whether anyone at JRK made any decision respecting the language contained in the form.

## DISCUSSION

### A.   Legal Framework

In Safeco Ins. Co. of Am. v. Burr, the Supreme Court considered two consolidated cases in which consumers had sued insurers for violations of 15 U.S.C. § 1681m(a), which requires that notice be provided to any consumer subjected to "adverse

10

action...based in whole or in part on any information contained in a consumer report." 551 U.S. 47, 52 (2007). One who "willfully fails" to provide such notice is civilly liable under 15 U.S.C. § 1681n.

The Supreme Court began by clarifying that "willfulness" in the context of the FCRA "cover[s] not only knowing violations, but reckless ones as well[.]" Safeco, 551 U.S. at 57 (internal citations omitted). The Court reasoned that a definition of willfulness encompassing "reckless disregard" was consonant with both the common law and the Court's interpretations of comparable language in other statutes. Id.

The Supreme Court then elaborated that "recklessness" is defined "in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" 551 U.S. at 68 (citing Farmer v. Brennan, 511 U.S. 825, 836 (1994)). Therefore, the Court held that a company subject to the FCRA "does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Id. at 69.

Importantly, however, the Supreme Court qualified that definition by stating that a defendant does not act willfully if

11

its "reading" of the statute, even if erroneous, was objectively reasonable.  Id.  In determining that Safeco's interpretation of the definition of "adverse action" was "not objectively unreasonable," the Supreme Court was influenced by three factors.  First, the statute did not define the term at issue; in other words, the statutory text was "less-than-pellucid." Id. at 69-70.  Second, the Court observed that Safeco's reading of the FCRA had a "foundation in the statutory text" that provided a sufficiently convincing justification to "have persuaded the District Court to adopt it and rule in Safeco's favor."  Id. at 70.  In other words, Safeco's interpretation, which had a basis in the statutory text, was sufficiently reasonable as to warrant adoption by an independent third party. Third, the Court found it significant that Safeco did not have "the benefit of guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned it away from the view it took."  Id.  Therefore, "[g]iven this dearth of guidance and the less-than-pellucid statutory text," the Court found that Safeco's reading was "not objectively unreasonable," and so "f[ell] well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability."  Id.

Safeco teaches that assessment of the willfulness issue involves a two-step inquiry.  First, it is necessary to

12

determine whether the defendant "adopt[ed]," and based its violative conduct on, an "interpretation" that was "objectively reasonable," as that concept was defined in Safeco, a question of law that both parties agree is to be decided by the Court. If the Court finds that the defendant's interpretation was objectively reasonable, its conduct falls within the safe harbor created by Safeco and the defendant is entitled to judgment as a matter of law on the issue of willfulness. And, that is what JRK now seeks.

If, however, the Court concludes that the interpretation was not objectively reasonable, it becomes necessary to determine whether the defendant's violation rose to the level of a knowing or reckless violation, as defined by Safeco. That determination, the parties agree, must be made by the jury.

**B.   Analysis**

With these principles in mind, and guided by the instruction provided by Safeco, the objective reasonableness issue will be assessed as it is presented on this record. For the reasons that follow, JRK's position does not pass muster under Safeco.

**1.   JRK Did Not "Interpret" The Statute.**

To take advantage of the "objectively reasonable interpretation" safe harbor, Safeco requires that the defendant have "adopt[ed]" and acted on an interpretation of the statute.

13

*Safeco*, 551 U.S. at 70 n.20.  That premise is clear from the language used in the holding in *Safeco*.  First, the Supreme Court repeatedly referred to the defendant's "reading," or "adopt[ion]" of an "interpretation" of the statute.  Second, the Court exonerated Safeco because it had acted in accordance with that reading when it violated the statute.  As the Court put it, "Safeco took the definition as excluding initial rate offers for new insurance, *and so* sent no adverse action notices" to the plaintiffs.  *Safeco*, 551 U.S. at 69.  That is, Safeco recognized its obligations to abide by the FCRA, examined the statute to determine what the statute required, and relied on that interpretation when it took the actions that violated the FCRA.

Thus, the initial question is whether the record shows that JRK actually interpreted § 1681b(b)(2) when it implemented the Standard Disclosure Form in 2008 and provided that form to the class members throughout the class period.  Here, there is no evidence that JRK actually adopted the interpretation of § 1681b(b)(2) that it has urged throughout this litigation when it violated the statute.  Instead, the record shows that JRK, uninformed by any analysis, simply used a form that had been provided to it by a third-party background check vendor.  There is no evidence that the background check vendor provided JRK with any interpretation of § 1681b(b)(2) at all, much less that the vendor made any comment on the propriety of the release

14

language.  In sum, there is nothing in the record from which the Court could infer that anyone at JRK made a decision as to what the word "solely" in § 1681b(b)(2) requires or that anyone at JRK ever sought advice on whether inclusion of the release in the form was permissible, either at the time that JRK adopted the Standard Disclosure Form or at any point thereafter. Therefore, the "objective reasonableness" analysis called for by Safeco does not apply in this case.

Relying on decisions from the United States Court of Appeals for the Third Circuit, JRK contends that it need not show that it "adopt[ed] an interpretation" of the statute to take advantage of the "objectively reasonable interpretation" safe harbor formulated by the Supreme Court in Safeco.  See Long v. Tommy Hilfiger U.S.A., Inc., 671 F.3d 371 (2012); Fuges v. Sw. Fin. Servs., 707 F.3d 241 (3d Cir. 2012).  And, those decisions do hold that requiring evidence of an express pre-litigation "interpretation" is "expressly foreclosed by Safeco, which held that evidence of subjective bad faith or intent of the defendant is irrelevant when there is an objectively reasonable interpretation of the statute that would allow the conduct in question." Long, 671 F.3d at 377 (citing Safeco, 551 U.S. at 70 n.20).

The principle announced in Long and Fuges is not at all persuasive because both decisions rest on the faulty premise

15

that determining whether a defendant adopted, and acted on, a
"reading" or "interpretation" of the statute requires an inquiry
into "subjective bad faith" or "subjective intent."  To support
that view, Long and Fuges rely on an erroneous reading of a
footnote in Safeco.  Long, 671 F.3d at 377; Fuges, 707 F.3d at
251-52.  That footnote actually reads as follows:

> Respondent-plaintiffs argue that evidence of
> subjective bad faith must be taken into
> account in determining whether a company
> acted knowingly or recklessly for purposes
> of § 1681n(a).  To the extent that they
> argue that evidence of subjective bad faith
> can support a willfulness finding even when
> the company's reading of the statute is
> objectively reasonable, their argument is
> unsound.  Where, as here, the statutory text
> and relevant court and agency guidance allow
> for more than one interpretation, it would
> defy history and current thinking to treat a
> defendant who merely adopts one such
> interpretation as a knowing or reckless
> violator.

Safeco, 127 S. Ct. at 70 n.20 (emphasis added).  Of course, the
footnote does deal with the topic of subjective bad faith and
how that relates to whether a company's interpretation of the
statute was objectively reasonable.  However, that footnote does
not eliminate the rest of the Safeco opinion, in which the
Supreme Court quite clearly found that Safeco had, and had acted
on, an interpretation of the statute at the time that it
violated the FCRA.  Indeed, the footnote on which Long, Fuges,
and JRK rely clearly contemplates that a court can, and should,

16

determine a company's "reading" of the statute and consider the reasonableness of that reading without any inquiry into subjective bad faith. And, that is perfectly logical because having an interpretation and relying on it at the time of the allegedly offending conduct is not a matter of subjective bad faith at all. Rather, whether a company had, and relied upon, an interpretation at the time it allegedly violated the act is an objectively demonstrable inquiry that simply determines what the company knew about the law at the time that it took the actions that are alleged to have violated the law, and whether it acted in reliance on that view of the law. Accordingly, the Court declines JRK's invitation to adopt the views expressed in Long and Fuges.

JRK also points to the analogy in Safeco to qualified immunity jurisprudence, which requires that an actor's conduct was objectively reasonable, and does not require the actor in question to demonstrate familiarity with the relevant jurisprudence. However, JRK overstates Safeco's reliance on the analogy to the qualified immunity analysis. Although the Supreme Court in Safeco cited Saucier v. Katz[3] for the proposition that the state of the law at the time of the defendant's violation is relevant to the objective reasonableness inquiry, nowhere did the Supreme Court hold, or

---

[3] 533 U.S. 194 (2001).

even suggest, that it intended to substitute the qualified immunity analysis for the determination of willfulness under the FCRA that the Court so thoroughly laid out in the rest of its opinion. To the contrary, in Safeco, the Court mentioned qualified immunity only once, in a parenthetical to a citation introduced by "Cf." See Safeco, 551 U.S. at 70. "Cf." is used to introduce a citation when the "[c]ited authority supports a proposition different from the main proposition but sufficiently analogous to lend support. Literally, 'cf.' means 'compare.'" The Bluebook: A Uniform System of Citation (Columbia Law Review Ass'n et al. eds., 20th ed. 2015) at 59. See also Lengel v. HomeAdvisor, Inc., 102 F. Supp. 3d 1202, 1211 (D. Kan. 2015) (noting the limits of the analogy between qualified immunity and willfulness in the context of statutory interpretation). Additionally, the Safeco Court considered not only the "dearth of guidance" in deciding that Safeco's interpretation was objectively reasonable, but also considered other factors, such as the statutory text, whether the defendant's reading had "a foundation in the statutory text," and whether the defendant offered a "sufficiently convincing justification" for its interpretation. Safeco, 559 U.S. at 69-70. Therefore, the comparison to qualified immunity does little to illuminate whether JRK must have had, and acted on, an interpretation of the statute when it violated the FCRA.

18

Given that the record shows that JRK never subscribed to a "reading" or "interpretation" of § 1681b(b)(2), JRK, of necessity, asserts that the Court may infer its interpretation of the law at the time that it violated the statute through its conduct: namely, the adoption and use of the form in question. However, the fact that JRK was sufficiently cognizant of the FCRA to know that it needed to provide applicants for employment with some sort of disclosure form does not give rise to a plausible inference that any employee, officer, or agent of JRK (1) had or subscribed to any interpretation or reading of § 1681b(b)(2) at all; (2) made any decision with respect to whether inclusion of the release language in that form was permitted by the statute; or (3) sought or acted on advice, legal or otherwise, with respect to that language. To the contrary, JRK takes the position that it simply used a form that it had received from a background check vendor, and that it relied on that vendor to interpret the law on JRK's behalf, even though there is no evidence that the vendor was ever retained for legal or compliance services.

## 2. JRK's Interpretation Is Objectively Unreasonable

Even assuming, arguendo, that the record showed that JRK acted on an "interpretation" of § 1681b(b)(2) (which it does not) in using the Standard Disclosure Form, the interpretation urged by JRK was not objectively reasonable because it is

contrary to the unambiguous language of § 1681b(b)(2), which requires a disclosure document that consists "solely" of the disclosure. As the Court has previously noted, the word "solely" generally means "'to the exclusion of all else,'" and the language of the statute "does not qualify the word 'solely' or otherwise limit its meaning." Milbourne v. JRK Residential Am., 92 F. Supp. 3d 425, 432 (E.D. Va. 2015) (internal citation omitted). Therefore, JRK's interpretation is "foreclosed by the straightforward statutory text." Seamans v. Temple Univ., 744 F.3d 853, 868 (3d Cir. 2014).

JRK contends that the plain meaning of the word "solely" is put into question by the statutory provision permitting an authorization to appear in the Standard Disclosure Form. That argument is unavailing. To begin, the allowance of a limited exception allowing the inclusion of an authorization cannot be the basis for inclusion of anything else. "Congress is obviously entitled to make an express exception within a statutory rule. Moreover, the court may construe from Congress's failure to make other exceptions that such other exceptions were not intended." Lengel, 102 F. Supp. 3d at 1211 (internal citations omitted). Indeed, if Congress had desired to make another exception, it surely could have so provided. That Congress did not do so does not cast any doubt on the plain meaning of the word "solely."

20

Thus, "[t]he key factor distinguishing this case from Safeco...is that the statutory provision at issue here cannot be called 'less-than-pellucid,' Safeco, [551 U.S. at 70], or anything close to it." Gillespie v. Equifax Info. Servs., LLC, 2008 WL 4316950, at *6 (N.D. Ill. Sept. 15, 2008). To the contrary, the statutory text is clear now and was clear when JRK started using the Standard Disclosure Form and throughout the class period.

It is true, as JRK notes, that there were no appellate decisions construing § 1681b(b)(2) at the time that it implemented the Standard Disclosure Form or during the class period. For that matter, there is no appellate authority on the issue even today. In addition, by the end of the class period, district courts had reached differing conclusions on the issue.[4] Contrast Singleton v. Domino's Pizza, LLC, 2012 WL 245965, at *8 (D. Md. Jan. 25, 2012) with Smith v. Waverly Partners, LLC, 2012

---

[4] JRK contends that the Court should consider the presence or absence of judicial and administrative authority as of late 2013, when Churcher, the class representative for the Impermissible Use Class, received and signed the Standard Disclosure Form. Cf. Saucier, 533 U.S. at 202 (for purposes of qualified immunity analysis, courts look to whether the law was clearly established at the time of the alleged constitutional violation). However, other class members received the form as early as 2010. Thus, no single date within the class period stands out as the ideal elevation from which to survey the legal landscape. However, because JRK continued to use the same form throughout the class period, the Court finds it appropriate to examine the judicial guidance that existed in 2013.

WL 3645324 (W.D.N.C. Aug. 23, 2012). And, as JRK points out, it lacked the benefit of any binding authority from the FTC.

However, a lack of judicial or administrative guidance cannot salvage an objectively unreasonable interpretation where the statutory text is clear. See, e.g., Dreher v. Experian Information Solutions, Inc., 71 F. Supp.3d 572, 580 (E.D. Va. 2014); Follman v. Hosp. Plus of Carpentersville, Inc., 532 F. Supp. 2d 960, 964 (N.D. Ill. 2007) (holding that, where "the text of [the] statute is clear and open to only one reasonable interpretation...a dearth of guidance does not render [a] defendant's readings plausible."). Moreover, in Waverly Partners, the only case decided before or during the class period that expressly permitted the use of release language, the court recognized that the inclusion of such language actually violated the text of § 1681b(b)(2), but ultimately found that the release was permissible, not because the statute was unclear, but because inclusion of the release was not so distracting as to undermine the purpose of the disclosure. 2012 WL 3645324, at *5-*6. In other words, as of 2013, no court had held that inclusion of release language complied with the text of the statute and at least one court had found to the contrary. See Singleton, 2012 WL 245965, at *8.

In addition to Waverly, JRK points to the decision in Burghy v. Dayton Racquet Club, Inc., 695 F. Supp. 2d 689 (S.D.

22

Ohio 2010) to support its "interpretation" of the statute. However, Burghy dealt with the "solely" language in § 1681b(b)(2) only as part of its discussion of the "conspicuousness" requirement, which was the dispositive issue in that case. Id. at 699 ("[i]ncluding the explanatory language alongside the disclosure language is logical, given their relationship, and the Court cannot conclude that the presence of the former renders the latter inconspicuous."). Thus, Burghy does not aid JRK's argument.

JRK also cites Schoebel v. American Integrity Ins. Co., 2015 WL 3407899 (M.D. Fla. May 27, 2015) and Syed v. M-I LLC, 2014 WL 5426862 (E.D. Cal. Oct. 23, 2014) in support of its argument on objective reasonableness. Schoebel and Syed found that, although inclusion of a release may not comply with the text of the statute, the meaning of the word "solely" in § 1681b(b)(2) is sufficiently flexible that inclusion of a release is not "objectively unreasonable." However, for the reasons set forth above, the Court finds the decisions to the contrary much more persuasive, and therefore declines to adopt the view articulated in Syed and Schoebel. See, e.g., Lengel, 102 F. Supp. 3d at 1211-12; Reardon v. Closetmaid Corp., 2013 WL 6231606, at *9 (W.D. Pa. Dec. 2, 2013); Singleton, 2012 WL 245965, at *9.

Furthermore, shortly after the enactment of the section at issue, the FTC expressly advised that inclusion of a liability waiver would violate § 1681b(b)(2)'s requirement that the disclosure be made in a document consisting "solely" of the disclosure.   Hauxwell Letter, 1998 WL 34323756 (June 12, 1998); see also Milbourne, 92 F. Supp. 3d at 431 (noting that FTC opinion letters are persuasive authority, even though they are not binding).   And, as noted above, the dearth of binding authority cannot rescue JRK's interpretation where, as here, the statutory text is unambiguous.   Dreher v. Experian Information Solutions, Inc., 71 F. Supp.3d 572, 580 (E.D. Va. 2014).   Nor does the dearth of appellate authority interject ambiguity into otherwise clear statutory text.   Therefore, even assuming that JRK has sufficiently demonstrated that it had ever "interpreted" § 1681b(b)(2) (which it has not), that interpretation was not objectively reasonable.

## CONCLUSION

For the foregoing reasons, the record here does not permit a finding that JRK held, and acted on, an objectively reasonable "interpretation" of 15 U.S.C. § 1681b(b)(2) in violating that statute by using the Standard Disclosure Form.   Therefore, JRK, is not entitled to the safe harbor provided by Safeco. Accordingly, JRK's oral motion for judgment as a matter of law on the issue of objective reasonableness will be denied, and the

24

question of whether JRK's violation of § 1681b(b)(2) was knowing or reckless will be decided by the jury.[5]

It is so ORDERED.

_____   /s/   _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August _11_ , 2016

---

[5] Because JRK seeks the Safeco safe harbor, it is logical that the burden of proving entitlement thereto should fall on JRK. However, in some of its briefs, JRK suggests that it is up to the Plaintiffs to prove that JRK's conduct was objectively unreasonable. Where that burden falls was somewhat confused by the Supreme Court's comment in Safeco that Safeco's reading was "not objectively unreasonable." Id. The parties have not squarely addressed the burden issue, but it is not necessary to resolve it here because no matter who has the burden, the record shows that JRK is not entitled to the Safeco safe harbor both because it neither adopted, nor acted on, any interpretation of § 1681b(b)(2); and because, even if JRK's conduct could be regarded as an interpretation on which it acted when it violated § 1681b(b)(2), the interpretation was not objectively reasonable.